# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELVIS RUSNAK, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 25-CV-292-LLA |
| | ) (ORAL ARGUMENT REQUESTED) |
| THE UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................ii

INTRODUCTION ............................................................................................... 1

SUMMARY OF CLAIMS AND ARGUMENT ....................................................... 3

BACKGROUND .................................................................................................. 5

      A.    The USVSST Act.................................................................................... 5

      B.    The Plaintiffs......................................................................................... 7

      C.    The Fairness Act ................................................................................... 7

      D.    DOJ's Response to GAO's Draft Report................................................. 9

      E.    GAO's Final Report ............................................................................ 11

      F.    Procedural Posture ............................................................................. 12

LEGAL STANDARD.......................................................................................... 13

ARGUMENT ..................................................................................................... 13

I.     The Comptroller General's Erroneous and *Ultra Vires* Interpretation of the Fairness Act Is Subject to Judicial Review (Count I). .......................... 13

II.    The Special Master Failed To Comply with the Non-Discretionary Statutory Obligation To Authorize Lump Sum Catch-up Payments to Plaintiffs in the Amounts Computed by GAO (Counts II & III). .............. 18

III.   This Court Has Subject Matter Jurisdiction Over All of Plaintiffs' Claims. .............................................................................................. 24

      A.    Plaintiffs' Claims Are Not Precluded by the USVSST Act........................... 25

      B.    Plaintiffs Have Established Article III Standing............................................ 35

IV.   Plaintiffs' Alternative Claim Against the Special Master Is Cognizable (Count IV)........................................................................................... 36

V.    The Court Should Not Dismiss Count V, Which Seeks an Order Preserving Necessary Funds. ................................................................... 40

CONCLUSION.................................................................................................. 40

APPENDIX - PERTINENT USVSST STATUTORY PROVISIONS ……….....…..…… Appx1

i

# TABLE OF AUTHORITIES

**CASES**

*Abbott Lab'ys v. Gardner*, 387 U.S. 136 (1967)................................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................13

*Beberman v. Blinken*, 61 F.4th 978 (D.C. Cir. 2023) ................................................39

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984)................................................25

*Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667 (1986)................................................25

*Braun v. United States*, 31 F.4th 793 (D.C. Cir. 2022)................................................30, 31, 32, 34

*Braun v. United States*, 531 F. Supp. 3d 130 (D.D.C. 2021)................................................31, 36

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ................................................39

*Cayuga Nation v. United States*, 594 F. Supp. 3d 64 (D.D.C. 2022) ................................................28

*Campuzano v. United States*, Case No. 24-cv-01652 (D.D.C. 2024)................................................34

*Chen v. GAO*, 821 F.2d 732 (D.C. Cir. 1987) ................................................16

*Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984)................................................16, 17

*College Sports Council v. GAO*, 421 F. Supp. 2d 59 (D.D.C. 2006)................................................16

*Dalehite v. United States*, 346 U.S. 15 (1953)................................................27

*Dugan v. Rank*, 372 U.S. 609 (1963) ................................................17

*Englehardt v. Garland*, 759 F. Supp. 3d 112 (D.D.C. 2024)................................................34

*Harmon v. Brucker*, 355 U.S. 579 (1958)................................................17

*Heckler v. Ringer*, 466 U.S. 602 (1984) ................................................29, 30, 35

*Hekmati v. United States*, 153 Fed. Cl. 800 (2021),
    *aff'd*, 51 F.4th 1066 (Fed. Cir. 2022)................................................32, 35

*Hekmati v. United States*, Case No. 23-cv-3774 (D.D.C. 2025)................................................33, 39

*Humane Soc'y of U.S. v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015)................................................35

*Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249 (D.C. Cir. 2005) ................................................13

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016) ................................................27, 36

*Larson v. Domestic & Foreign Corp.*, 337 U.S. 682 (1949) .......................................................17

*Lindahl v. OPM*, 470 U.S. 768 (1985)..........................................................................................25

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)...........................................................................13

*Marbury v. Madison*, 1 Cranch 137 (1803) .................................................................................28

*Malone v. Bowdoin*, 369 U.S. 643 (1962) ....................................................................................17

*Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062 (D.C. Cir. 2018)........................................................25

*Miller v. Baker*, 969 F.2d 1098 (D.C. Cir. 1992)..........................................................................39

*N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070 (D.C. Cir. 2007)...................................30

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*,
    443 F.2d 689 (D.C. Cir. 1971).................................................................................................23

*O'Neill v. Garland*,
    2022 WL 17415057 (D.D.C. Dec. 5, 2022).....................................................................32, 33, 35

*Parrish v. United States*, 145 S. Ct. 1664 (2025) ........................................................................22

*Pond Constructors, Inc. v. U.S. GAO*,
    2018 WL 3528309 (D.D.C. May 30, 2018)...............................................................................16

*Roman Cath. Diocese v. Cuomo*, 592 U.S. 14 (2020) ..................................................................40

*Schneider v. Feinberg*, 345 F.3d 135 (2d Cir. 2003) ...................................................................34

*Soto v. United States*, 145 S. Ct. 1677 (2025)........................................................................23, 28

*Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111 (D.C. Cir. 2000)............................................13

*United States Inst. of Peace v. Jackson*,
    2025 WL 1840572 (D.C. Cir. June 27, 2025)..........................................................................15

*\*United States Inst. of Peace v. Jackson*,
    2025 WL 1428641 (D.D.C. May 19, 2025)...............................................................................15

**STATUTES**

*5 U.S.C. § 104.........................................................................................................................14, 15

*5 U.S.C. § 105.........................................................................................................................14, 15

5 U.S.C. § 551...............................................................................................................................14

*5 U.S.C. § 701 ..................................................................................................14, 25

*5 U.S.C. § 702 ........................................................................................................14

*5 U.S.C. § 706 ........................................................................................................39

31 U.S.C. § 702 ........................................................................................................14

31 U.S.C. § 704 ........................................................................................................14

*34 U.S.C. § 20144 .............................................................................................. passim

*Fairness for 9/11 Families Act ("Fairness Act"),
   Pub. L. No. 117-328, Div. MM, 136 Stat. 4459, 6106-11 (2022) .................................. passim

Justice for United States Victims of State Sponsored Terrorism,
   Pub. L. No. 114-113, Div. O, tit. IV, § 404, 129 Stat. 2242, 3007-18 (2015) .........................5

## REGULATIONS

*Justice for United States Victims of State Sponsored Terrorism Act, 81 Fed. Reg.
   45,535, 45,537 (July 14, 2016) ........................................................................21, 37

## RULES

Fed. R. Civ. P. 12(b) ..................................................................................................13

## OTHER AUTHORITIES

*U.S. GAO, *U.S. Victims of State Sponsored Terrorism Fund: 1983 Beirut Barracks and
   1996 Khobar Towers Bombing Claimants Due $614 Million* (Nov. 1, 2024) ................. passim

*U.S. DOJ, *Response to Government Accountability Office Draft Report* (Oct. 3, 2024) .... passim

*U.S Victims of State Sponsored Terrorism Fund Frequently Asked Question (FAQs),
   https://www.usvsst.com/Home/Faq#7.1 ..........................................................9, 19, 23, 37, 38

USVSST Financial Report (Mar. 31, 2025),
   https://www.usvsst.com/Home/FundBalance (last updated Mar. 31, 2025) .........................22

## INTRODUCTION

Plaintiffs are veterans who were injured in the 1996 Khobar Towers bombing while honorably serving overseas as active-duty members of the United States Air Force.  Plaintiffs timely applied for compensation from the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund" or "Fund") in exchange for assigning rights to the United States to collect on the default judgments they obtained as a result of their injuries.  The Special Master made the one-time determination that each of the Plaintiffs were eligible to receive compensation from the Fund.  Subsequently, in December 2022, Congress amended the USVSST governing statute by enacting the Fairness for 9/11 Families Act ("Fairness Act").  The Fairness Act mandated one-time lump sum catch-up payments for "each" individual whose claims arose out of the 1983 Beirut barracks bombing or the 1996 Khobar Towers bombing.  The Fairness Act directed the Comptroller General to determine the amount of such payments for "each" such victim according to certain statutory criteria.  The Fairness Act left in place the Special Master's exclusive responsibility to determine eligibility for all compensation from the Fund, including lump sum catch-up payments.

The Comptroller General and Special Master interpreted the Fairness Act in conflicting and irreconcilable ways.  The Comptroller General (acting through GAO) read the Fairness Act as requiring certain claimants to resubmit applications that they timely submitted, and which the Special Master accepted and deemed eligible, before the Fairness Act was enacted.  GAO also interpreted the Fairness Act to require the Special Master to change her procedures and guidance to accept such entirely duplicative applications.  The Special Master (through DOJ, which supplies her staff) disagreed.  In a formal memorandum issued on her behalf, DOJ found that the Fairness Act did not create any such meaningless requirement, and GAO had no statutory authority for its belated and erroneous interpretation of the Fairness Act because it would conflict

1

with and impinge on the Special Master's exclusive statutory authority to determine eligibility for all compensation from the Fund. DOJ also made the case that as a practical matter, duplicative applications were not required, were not necessary, were not permitted, and would amount to wasteful paper shuffling.

Yet when the Comptroller General (through GAO) issued his final report, he rejected DOJ's comments and decreed that Plaintiffs and 272 others were not eligible to receive lump sum catch-up payments because they did not re-submit their applications (which, under Fund procedures, the Special Master did not allow and would have rejected). Despite formally having disagreed in writing with GAO's interpretation of the Fairness Act, the Special Master disavowed discretion or authority to act in any way other than as GAO had decided and directed in its final report.

Adding insult to injury, the Special Master refused to comply with her express statutory duty to update Fund procedures and guidance as necessary to implement GAO's interpretation of the Fairness Act. The Special Master therefore left in place inconsistent Fund procedures— which prohibited staff from accepting the very duplicative applications GAO believed that the Fairness Act authorized and required—and inconsistent Fund guidance—which advised claimants that duplicative applications were not necessary.

Plaintiffs (and 272 others) were trapped in a bureaucratic Catch-22 attributable in the first instance to GAO's misinterpretation of the Fairness Act. But this injustice can and should be remedied by this Court. GAO's actions are not shielded from APA review, and at any rate, the APA's waiver of sovereign immunity is not necessary for the Court to set aside action GAO took in excess of its statutory authority. Although the USVSST statute precludes judicial review of "decisions made by the Special Master with regard to compensation from the Fund," the only

"decisions" at issue here were made by the Comptroller General, not the Special Master.  That distinguishes this case from all of the authorities Defendants relied upon to argue that Plaintiffs' claims are precluded.  Moreover, this Court may compel the Special Master to comply with non-discretionary statutory obligations that do not involve "decisions" that are shielded from judicial review.

Defendants' motion to dismiss should be denied in its entirety.  Plaintiffs respectfully request oral argument.

## SUMMARY OF CLAIMS AND ARGUMENT

*First*, GAO's erroneous and *ultra vires* interpretation of the Fairness Act is the root cause of the unlawful failure of their lump sum catch-up payments to be authorized.  The Court can and should set aside GAO's unlawful determination that Plaintiffs were not eligible to be authorized such payments.  Count I seeks a determination by this Court that GAO's interpretation of the Fairness Act to create new eligibility requirements was incorrect and/or beyond its statutory authority.  Defendants are wrong to argue that GAO's interpretation of the Fairness Act is not subject to judicial review for two reasons: (1) Congress has expressly defined GAO as an Executive agency whose actions are subject to review under the Administrative Procedure Act ("APA"); and (2) in any event, the APA's waiver of sovereign immunity is not necessary to set aside action that exceeds GAO's statutory authority.  Moreover, the Comptroller General's decisions are not precluded from judicial review as decisions "made by the Special Master."

*Second*, the Fairness Act expressly defines the two groups of claimants for whom the Special Master is *required* to authorize lump sum catch-up payments.  GAO's opinion about *who* among those groups should—or should not—be authorized payments had no legal effect on the Special Master's statutory obligation to authorize payments to "each" member of the groups specified by Congress.  Counts II and III therefore provide an independent path for Plaintiffs to

3

be awarded the relief they seek even if GAO's interpretation of the provisions of the Fairness Act that govern the Comptroller General's actions are not set aside by this Court.

Defendants concede that the Special Master has no discretion in exercising her "shall authorize" obligation, but they argue that the Fairness Act compelled the Special Master to follow not only the Comptroller General's determination of payment *amounts*, but also his determination of *who* should be authorized payments. That is incorrect. The statutory interpretation question boils down to which of two different alternative directives did Congress enact. Did the Fairness Act *require* the Special Master to authorize payments to "each" of the statutorily-defined claimants in *amounts* determined by GAO, as its plain text and structure indicate? Or did the Fairness Act *prohibit* the Special Master from authorizing such payments to anyone other than "the individuals*"* the GAO determined were eligible to receive the payments, as Defendants argue? *See* ECF No. 22-1 ("Defs.' Mot.") at 15. The answer is clear—the Special Master was obligated to authorize payments to "each" member of the two statutorily-defined groups. The Special Master's contemporaneous written disagreement with GAO on this point is consistent with Plaintiffs' arguments and inconsistent with Defendants' litigation position.

It could hardly be clearer that Defendants are wrong. Congress went out of its way to precisely define who was to be authorized catch-up payments and to direct—in classic mandatory language—that the Special Master "shall authorize" payments to "each" member of those groups. The statutory definition carefully crafted by Congress incorporated the Special Master's one-time determination of eligibility under subsection (c) of the statute. The Comptroller General had no basis—and no authority—to exclude members of the statutorily-defined groups. Doing so was inconsistent with the statutory command because the result was that "each" member of those groups was *not* authorized payment.

Counts II and III therefore seek a declaration and order requiring the Special Master to fulfill her non-discretionary obligation to authorize payments to Plaintiffs in the amounts that GAO computed for their lump sum catch-up payments. Counts II and III do not challenge precluded "decisions made by the Special Master" because the Special Master's obligation to authorize payment to Plaintiffs was a non-discretionary obligation, not a decision to be made.

*Finally*, in the alternative, if GAO's interpretation were deemed by the Court to be binding on the Special Master, then the Special Master violated the Fairness Act by failing to fulfill her express statutory obligation to update Fund procedures and guidance to permit Plaintiffs to satisfy the new statutory requirement conceived and imposed by GAO. Defendants argue that the Fairness Act should be interpreted as creating a limited window in which the Special Master had discretion (but was not required) to update Fund procedures and guidance to conform to the Fairness Act. According to Defendants, after that window expired, the Special Master was powerless to do so. That is inconsistent with the statutory text and context, the Special Master's consistent practices, and common sense. And it should go without saying that an agency's violation of a statute by failing to comply with a statutory deadline does not divest the Court of its power to remedy the violation.

Defendants' other arguments are unavailing, and their motion should be denied.

## BACKGROUND

### A. The USVSST Act

In 2015, Congress enacted the U.S. Victims of State Sponsored Terrorism Act (the "Act").[1] The Act established the USVSST Fund, which compensates certain victims of acts of international state-sponsored terrorism through regular (annual, when funds are available) rounds

---

[1] Pub. L. No. 114-113, Div. O, tit. IV, § 404, 129 Stat. 2242, 3007-18 (2015); 34 U.S.C. § 20144.

of payments. *Id.* § 20144(e)(6). In general, USVSST participants assign to the United States the right to collect on money judgments against a state sponsor of terrorism in exchange for future distributions from the Fund. Funding is provided by a combination of direct appropriations and certain recoveries by the U.S. government in civil and criminal proceedings. The USVSST Fund is administered by a Special Master, who is appointed by the Attorney General, and it is supported by Department of Justice employees.

Subsection (b) of the Act is entitled "Administration of the United States Victims of State Sponsored Terrorism Fund." *Id.* § 20144(b). This subsection addresses administration of the Fund, publication of regulations and procedures, and decisions of the Special Master. Subsection (b) provides that "[a]ll *decisions made by the Special Master with regard to compensation* from the Fund shall be—(A) in writing and provided to the Attorney General, each claimant, and, if applicable, the attorney for each claimant; and (B) *final* and, except as provided in paragraph (4), *not subject to administrative or judicial review.*" *Id.* §§ 20144(b)(3)(A)-(B) (emphases added).

Subsection (c) of the Act is entitled "Eligible Claims." *Id.* § 20144(c). It lays out eligibility requirements, including the deadlines for submitting applications. "[A] claim is an eligible claim if the Special Master determines that" the pertinent criteria are satisfied. *Id.* § 20144(c)(1).

Subsection (d) of the Act is entitled "Payments," and it (1) specifies to whom payments are made, (2) addresses timing of initial payments, (3) details how the Special Master is to determine the amount of regular distributions, and (4) provides for certain additional payments, including lump sum catch-up payments to statutorily-defined claimants. *Id.* § 20144(d).

The Act has been amended three times: (1) on November 21, 2019 by the USVSST Fund Clarification Act; (2) on December 27, 2020 by the Sudan Claims Resolution Act; and (3) on

December 29, 2022 by the Fairness Act. The Act, together with its three amendments, is referred to as the "USVSST Act" or the "USVSST statute."

### B.    The Plaintiffs

Plaintiffs are veterans who were injured in the 1996 Khobar Towers bombing while honorably serving overseas as active-duty members of the United States Air Force. Compl. ¶ 1.

Plaintiffs separately received judgments in 2019 and 2020 against a state determined to be responsible for the 1996 bombing of the U.S. Air Force barracks facility in Saudia Arabia known as Khobar Towers. *Id*. ¶¶ 22-23. Plaintiffs timely submitted applications to participate in the USVSST fund. *Id*. ¶ 34. The Special Master determined each Plaintiff's claim met the statutory eligibility requirements and was therefore an "eligible" claim. *Id*. ¶ 36.

As of December 29, 2022, when the Fairness Act became law, one Plaintiff had received a single regular distribution from the fund totaling approximately 5.84% of his claim, and the other Plaintiff had yet to receive a distribution from the Fund. *See id.* ¶ 38.

### C.    The Fairness Act

On December 29, 2022, the Fairness Act became law. Pub. L. No. 117-328, Div. MM, 136 Stat. 4459, 6106-11 (2022). The Fairness Act mandated lump sum catch-up payments for "each" 1983 Beirut barracks bombing victim and "each" 1996 Khobar Towers bombing victim. These payments were designed to "catch up" the amounts received by victims of the Khobar Towers and Beirut barracks bombing (who the Special Master had determined to be eligible) to the average payments received by all non-9/11 victims as a percentage of their claims during the first three rounds of the Fund distributions. *See* 34 U.S.C. §20144(d)(4)(D)(i); Ex. B, at 11. The Comptroller General determined that percentage to be 16.0353% as of December 29, 2022. *See* Ex. B, at 11. The Plaintiffs had received far less. Compl. ¶ 38.

The Fairness Act required that the Special Master "shall authorize lump sum catch-up payments from the reserve fund . . . in amounts equal to the amount described in subclauses (I) and (II) of clause (iii)." 34 U.S.C. § 20144(d)(4)(D)(iv)(II). Those subclauses *required* the Comptroller General to compute and report the amounts of such payments for *each* victim with an eligible claim arising out of those two terrorist attacks:

> . . . the Comptroller General . . . shall submit to [Congressional Committees] and the Special Master a report that includes the determination of the Comptroller General on (I) the amount of the proposed lump sum catch-up payment for *each* 1983 Beirut barracks bombing victim*; [and]* (II) the amount of the proposed lump sum catch-up payment for each 1996 Khobar Towers bombing victim . . . .

*Id.* § 20144(d)(4)(D)(iii). As pertinent here, the term "1996 Khobar Towers bombing victim" is defined by the Fairness Act to include a claimant "who has an eligible claim under subsection (c) that arises out of the June 25, 1996 bombing of the Khobar Tower housing complex in Saudi Arabia." *Id.* § 20144(j)(16)(A). Subsection (c) provides that "a claim is an eligible claim if the Special Master determines that" the statutory criteria are met. 34 U.S.C. § 20144(c)(1).

The Fairness Act also extended the application deadline for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims who obtained a judgment before enactment of the Fairness Act, but who failed to submit applications within "90 days after the date of obtaining final judgment." 136 Stat. 6107. Before the Fairness Act, the application deadline for claimants whose underlying judgments post-dated 2015 was "[n]ot later than 90 days after the date of obtaining a final judgment." *Id.* § 20144(c)(3)(A)(ii). The Fairness Act extended the application deadline for such claimants to apply within "180 days from the date of enactment of [the Fairness] Act [which was December 29, 2022]." *Id.*

In addition, the Fairness Act required the Special Master to conform Fund procedures and guidance to the Fairness Act:

> Not later than 30 days after the date of enactment [of the Fairness Act], the
> Special Master shall update, as necessary as a result of the enactment of [the
> Fairness Act], such procedures and other guidance previously issued by the
> Special Master.

*Id.* § 20144(b)(2)(A).  Following the passage of the Fairness Act, the Special Master made no

changes to the Fund's application procedures in the Federal Register.  The Special Master did,

however, routinely update her "guidance," which is promulgated in the form of Frequently

Asked Questions or "FAQs," both before and after the Fairness Act was enacted.

In the FAQs, the Special Master explained that "[l]ump sum catch-up payments are one-

time payments the Act directs the USVSST Fund Special Master to make to certain claimants

using separate funding, apart from the USVSST Fund's other statutory distributions."  FAQ 7.1.[2]

The Special Master further stated that:

> Claimants do not need to file additional or separate applications for lump sum
> catch–up payments.  Each claimant has one claim before the USVSST Fund for
> all compensation, including lump sum catch-up payments.

*Id.*  Indeed, this guidance made clear that any duplicative applications would be rejected: "The

USVSST Fund cannot accept duplicative filings."  *Id.*

Neither the fund procedures nor FAQ 7.1 were changed to reflect GAO's opinion that the

Fairness Act required certain claimants to submit more than one application.

### D.    DOJ's Response to GAO's Draft Report

The Department of Justice ("DOJ") provides staff that support the Special Master and the

Fund.  On October 3, 2024, DOJ issued a formal memorandum to a draft report issued by the

Comptroller General.  Exhibit A (U.S. DOJ, *Response to Government Accountability Office*

---

[2] *U.S Victims of State Sponsored Terrorism Fund: Frequently Asked Question (FAQs)*, U.S.
DOJ, https://www.usvsst.com/Home/Faq#7.1 (last updated Apr. 30, 2025).

*Draft Report* (Oct. 3, 2024)).  DOJ criticized and disagreed with certain conclusions in GAO's draft report.

DOJ stated that the Fairness Act "left Fund application procedures and eligibility determinations in the discretion of the Special Master."  *Id*. at 5.  And "[t]he Special Master determines the eligibility of each claim's application once."  *Id*. at 3.  In DOJ's view, "[t]here were no separate or distinct eligibility or application procedures for these [lump sum catch-up payments]."  *Id*. at 5.

DOJ noted that GAO did not announce this new purported requirement until more than a year after the expanded application deadline expired.  *Id*. at 5-8.  DOJ pointed out that this left claimants who had followed fund procedures and guidance with no way to qualify for catch-up payments.  *Id*. at 5.[3]  Consistent with the Special Master's view that duplicative applications were not required, were not necessary, and were not permitted "the Fund administratively closed any successive or duplicate applications submitted by victims of the 1983 Beirut barracks bombing or the 1996 Khobar Towers bombing who had already been found eligible by the Special Master before the enactment of the Fairness Act."  *Id*.

DOJ concluded that the Fairness Act "directs the GAO to include in its final report a determination of the amount of the proposed lump sum catch-up payment 'for each' 1983 Beirut barracks bombing victim and 1996 Khobar Towers bombing victim."  *Id*. at 9 (quoting 34 U.S.C. §§ 20144(d)(4)(D)(iii)(I), (II)).  DOJ thus fundamentally disagreed with GAO's view that the Fairness Act required victims who applied before its enactment to submit new applications in

---

[3] DOJ also noted that GAO's interpretation was inconsistent with the implementation of a parallel provision providing for lump sum catch-up payments for 9/11 victims.  Ex. A at 3-4 n.4 (noting that 9/11 claimants who had applied before the pertinent enabling legislation was enacted were authorized lump sum catch-up payments based upon their pre-existing applications and determinations of eligibility).

order to receive catch-up payments: "The Fairness Act did not mandate or establish separate application procedures for these or other [lump sum catch-up payments]." *Id*. at 6. DOJ further explained that the Fund's long-standing procedures "have always set forth only a single application and eligibility determination for each claim." *Id*. DOJ also observed that "[c]laimants had no notice" that GAO would create "a new and separate process." *Id*. at 7.

DOJ also made clear that GAO's duplicative application requirement would be meaningless because there was no practical need to collect additional information from those victims who had previously been determined to have eligible claims. *Id*. Moreover, using readily available information, including information provided in the original applications, "GAO was able to calculate [lump sum catch-up payments] even for the 274 claimants who did not make a successive application . . . ." *Id*. at 7 & n.10; *see also id*. at 9 (noting that "the GAO nevertheless has calculated the [lump sum catch-up payments] for these claimants and included that amount in the draft Report").

### E.      GAO's Final Report

In November 2024, the Comptroller General (acting through GAO) issued the final report that Congress mandated to include the Comptroller General's determination of lump sum catch-up payment amounts for each of the victims of the Beirut barracks and Khobar Towers bombings. Exhibit B (U.S. GAO, *U.S. Victims of State Sponsored Terrorism Fund: 1983 Beirut Barracks and 1996 Khobar Towers Bombing Claimants Due $614 Million* (Nov. 1, 2024)). GAO determined that approximately $614 million was to be authorized for payment to claimants who had submitted applications after the Fairness Act was enacted. *Id*. at 10.

GAO adhered to the view that the Fairness Act required 274 claimants (who had applied and were deemed eligible before enactment) to submit duplicative applications. *Id*. at 5. GAO also opined that the Fairness Act *permitted* claimants to do so notwithstanding the Special

Master's inconsistent procedures and guidance:

> The Fairness Act, in directing the Comptroller General to determine amounts of lump sum catch-up payments, also *permitted* Beirut barracks bombing and Khobar Towers bombing victims who had previously applied and been deemed eligible for regular distribution payments from the Fund *to submit duplicate or successive applications* to the Fund in order to apply for these catch-up payments.

*Id*. at 6 (emphases added). Despite GAO's assertion that 274 claimants were ineligible because they did not submit (and were not allowed to submit) duplicative applications, GAO computed the amounts of those payments to ensure they could be made if there were a change in law (as interpreted by GAO):

> To ensure that the Fund can identify these claimants and make payments if the statute is amended, *we are providing the claim identification numbers and lump sum catch-up payment amounts that we calculated for the 274 claimants to the Special Master with this report*.

*Id*. at 20 (emphasis added). GAO determined that 274 claimants would be entitled to payments totaling approximately $116 million, *id*. at 19, with individual payments reported to the penny.

## F.    Procedural Posture

After communicating with the Defendants and receiving no substantive response, Compl. ¶ 41, Plaintiffs filed the complaint in this case on January 31, 2025. On February 25 and April 14, 2025, the parties stipulated to terms on which Defendants would preserve necessary funds with advance notice to be provided if circumstances change. *See* ECF Nos. 12, 15. On May 21, 2025, the Court granted Defendants' motion to consolidate the briefing schedule of this case with *Christie v. United States*, No. 25-cv-932, pursuant to Federal Rules of Civil Procedure 6(b) and 42(a). On June 9, 2025, Defendants filed an identical motion to dismiss in both cases. ECF No. 22. Defendants' motion to dismiss does not distinguish between the two cases in any way that is material to the disposition of their motion to dismiss. Accordingly, the arguments made by

plaintiffs in each case apply equally in the other case, but for the sake of efficiency, *Rusnak* Plaintiffs do not repeat in full the arguments made in *Christie*.

## LEGAL STANDARD

Under Rule 12(b)(1), a plaintiff bears the burden of establishing that the Court has subject-matter jurisdiction to hear his claims. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Under Rule 12(b)(6), "detailed factual allegations" are not necessary, but "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The Court must "treat the complaint's factual allegations as true, and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (cleaned up); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).

## ARGUMENT

I.    **The Comptroller General's Erroneous and *Ultra Vires* Interpretation of the Fairness Act Is Subject to Judicial Review (Count I).**

Count I challenges GAO's interpretation of the Fairness Act as imposing an empty requirement to re-submit applications. Defendants notably have chosen not to defend GAO's statutory interpretation on the merits.[4] Instead they argue that GAO's interpretation of the Fairness Act to create an insurmountable barrier for certain claimants is unreviewable under the APA because, according to Defendants, GAO falls within the APA exception for "the Congress." Defs.' Mot. at 10. That is incorrect for two reasons: (1) Congress subjected GAO to suit under

---

[4] The Comptroller General's undefended statutory interpretation is incorrect for the reasons outlined in Plaintiffs' Complaint and their pre-filing letter to Defendants. *See* Compl. ¶ 43 & Compl. Ex. A at pp. 8-11.

the APA by expressly defining it to be an Executive agency for the purpose of Title 5; and (2) the APA's waiver of sovereign immunity is not necessary to set aside GAO's *ultra vires* determination that Plaintiffs are not eligible for the payments at issue.

The APA waives sovereign immunity for challenges to "agency action," 5 U.S.C. § 702, including an agency's "failure to act," *id*. §§ 551(13), 701(b)(2). An "agency" is "each authority of the Government of the United States," with the exception, as pertinent here, of "the Congress," *id*. § 701(b)(1)(A). Defendants do not dispute that GAO is an "authority of the Government of the United States" and therefore within the APA's broad definition of "agency." The only question raised by Defendants' motion is whether the APA's exception for "the Congress" excludes GAO's actions from APA review. It does not.

GAO's organic statute defines it as "an instrumentality of the United States Government independent of the executive departments." 31 U.S.C. § 702(a). Congress provided that "[t]o the extent applicable, all laws generally related to administering an agency apply to the Comptroller General." *Id.* § 704(a). With regard to GAO's status under Title 5 (and the APA, which also is codified within Title 5), Congress spoke directly to the issue. Congress defined GAO to be an "Executive agency." 5 U.S.C. § 105 ("For the purpose of this title, 'Executive agency' means an Executive department, a Government corporation, and an independent establishment."); *id*. § 104(2) ("For the purpose of this title, 'independent establishment' means . . . the Government Accountability Office."). Congress thus expressly mandated that GAO be subject to APA review in the same manner as the Executive departments (such as the Department of State, the Department of Defense, and DOJ, among others).

Defendants argue that GAO is part of the Legislative branch and therefore within the APA's statutory exception for "the Congress." Defs.' Mot. at 9. Defendants are incorrect.

14

While GAO may be part of the Legislative branch for certain other purposes, GAO is an "Executive agency" for the purposes of the APA.[5]  The fact that Congress singled out GAO *by name* as an "independent establishment," and therefore "Executive agency," leaves no room for debate about Congress's intent for GAO's status under the APA.  Congress's designation of GAO as an Executive agency conclusively establishes that GAO is not excepted from APA review as part of "the Congress."

This Court recently recognized and elaborated on GAO's dual status in a decision analyzing the status of a different entity.  *See United States Inst. of Peace v. Jackson*, 2025 WL 1428641, at *24 (D.D.C. May 19, 2025).  The Court noted that although GAO is generally considered part of the Legislative branch, "the definition of 'executive agency,' under 5 U.S.C. § 105, which applies to the APA and other statutes governing executive agencies, explicitly includes GAO." *Id*.  The Court further explained that GAO's dual status—as an Executive agency for purpose of the APA and as part of the Legislative branch for other purposes—is reflective of the fundamental precept that "[f]ederal entities may be classified as legislative for one purpose but treated as executive for others." *Id*.[6]

Defendants' authorities do not salvage their plainly incorrect argument.  Defendants rely on a single unpublished district court decision and two decisions that did not decide the issue.

---

[5] "[I]ndependent establishment" is defined as (1) an establishment *within the executive branch* with certain exceptions; and (2) GAO.  5 U.S.C. § 104.  This structure recognizes that even though GAO is not considered to be "within the executive branch" for certain purposes, Congress singled out GAO by name to be treated as an "Executive agency" under Title 5.

[6] On June 27, 2025, the D.C. Circuit granted the government's motion for a stay pending appeal in part based upon the government's argument—which if anything further supports Plaintiffs' position here that dual entities can be Executive agencies for certain purposes—that "the Institute exercises substantial executive power."  *United States Inst. of Peace v. Jackson*, 2025 WL 1840572, at *1 (D.C. Cir. June 27, 2025).

Defs.' Mot. at 9.  *Pond Constructors, Inc. v. U.S. GAO*, 2018 WL 3528309 (D.D.C. May 30, 2018) is an unpublished district court opinion that failed to consider the conclusive definition in Title 5 (which the parties there presumably failed to bring to the attention of the Court, as did Defendants in their motion here).  *Pond Constructors* erred in not recognizing that Congress spoke to the issue in Title 5 and in relying on *dicta* characterizing GAO as part of the Legislative branch for different purposes.  Defendants' reliance on two other authorities fares no better. Those decisions did not purport to decide the question presented here.  The issue in *Chen v. GAO*, 821 F.2d 732 (D.C. Cir. 1987), was whether GAO's Personnel Appeals Board ("PAB") applied the correct standard of review.  *Id*. at 733.  The D.C. Circuit made clear—in the same footnote upon which Defendants rely—that it was looking to the APA "only by way of analogy, as it is not directly applicable to the PAB."  *Id*. at 737 n.6.  Likewise, in *College Sports Council v. GAO*, 421 F. Supp. 2d 59 (D.D.C. 2006), the Court stated that it was "ultimately unnecessary" to reach a conclusion as to whether GAO is an agency for the purposes of the APA.  *Id*. at 66-67. The Court instead decided the case on a different ground that is not argued by Defendants here. *Id.* at 67-68.  To the extent that Defendants suggest that *College Sports Council* decided this issue, they are wrong.

The D.C. Circuit in *Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir. 1984), a decision that Defendants did not cite, held that the Library of Congress is excluded from the APA by the statutory exception for "the Congress."  Unlike GAO, however, the Library of Congress's organic legislation is located in Title 2 ("The Congress").  *See* Title 2, ch. 5 ("Library of Congress"), §§ 131-186.  And unlike GAO, the Library of Congress is not defined as an Executive agency.  The D.C. Circuit's holding that the Library of Congress is not subject to APA review thus does not apply to GAO's status under the APA.  Pertinent here, however, is *Clark*'s

holding that the APA's waiver of sovereign immunity *was not necessary* to the extent plaintiff's claims were based upon actions allegedly taken outside the scope of the Library's statutory authority.  *See Clark*, 750 F.2d at 102 ("It is well-established that sovereign immunity does not bar suits for specific relief against government officials where the challenged actions of the officials are alleged to be unconstitutional or beyond statutory authority.")  (citing *Dugan v. Rank*, 372 U.S. 609, 621-23 (1963); *Malone v. Bowdoin*, 369 U.S. 643, 646-48 (1962); *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 689-91 (1949)).  That holding applies here as well.

The Fairness Act obligated GAO to compute and report *amounts* of proposed lump sum catch-up payments for "each 1983 Beirut barracks bombing victim" and "each 1996 Khobar Towers bombing victim."  The Fairness Act *did not* authorize the Comptroller General to impose additional eligibility requirements beyond those set forth in subsection (c) of the statute.  *See* Compl. ¶ 55.  When GAO erroneously concluded that duplicative applications would be required, it exceeded its statutory authority under the Fairness Act.  Thus, this Court need not even reach the question of whether GAO is subject to APA review to set aside GAO's *ultra vires* imposition of an additional, unauthorized eligibility requirement.  *See Harmon v. Brucker*, 355 U.S. 579, 582 (1958) ("The District Court had . . . power to construe the statutes involved to determine whether the respondent did exceed his powers.  If he did so, his actions would not constitute exercises of his administrative discretion, and, in such circumstances as those before us, judicial relief from this illegality would be available."); *Clark*, 750 F.2d at 102.  And because the question of whether GAO acted with or without statutory authorization is intertwined with the merits of its interpretation of the Fairness Act—which Defendants have studiously avoided in their motion—Count I must survive.

II.    **The Special Master Failed To Comply with the Non-Discretionary Statutory Obligation To Authorize Lump Sum Catch-up Payments to Plaintiffs in the Amounts Computed by GAO (Counts II & III).**

Counts II and III seek a declaration and order compelling the Special Master to comply with her statutory obligation to authorize lump sum catch-up payments to Plaintiffs in the amounts reported by GAO.  Compl. ¶¶ 65-73.[7]

Defendants argue, Defs.' Mot. at 15, that Counts II and III fail because the Fairness act "dictates that the Special Master make lump sum catch-up payments" not only in amounts determined by the Comptroller General, but also "to the individuals" specified by GAO. Defendants' argument for dismissal of Counts II and III merge with the merits question of what the statute obligated the Special Master to do.

While Plaintiffs agree that the Fairness Act's command to authorize lump sum catch-up payments involves no discretion on the part of the Special Master, Defs.' Mot. at 15, Plaintiffs disagree with Defendants' argument that the Fairness Act required the Special Master to authorize payments only to individuals specified by GAO.  In fact, the Fairness Act unequivocally commands the Special Master to authorize lump sum catch-up payments to "each" 1996 Khobar Towers bombing victim (as defined by the Fairness Act) in *amounts* determined by the Comptroller General.  DOJ's contemporaneous statements disagreeing with GAO are consistent with Plaintiffs' position here (and inconsistent with Defendants' litigation position). DOJ made clear that the Fairness Act did *not* alter the Special Master's exclusive responsibility

---

[7] Defendants misconstrue Count II as a claim solely against GAO.  Defs.' Mot. at 12 n.6.  Count II in fact seeks a declaration that GAO's (incorrect) interpretation of the Fairness Act regarding eligibility requirements "does not limit the scope of the Special Master's statutory obligation to authorize catch up payments," Compl. ¶ 68, and it expressly incorporates all of the Complaint's "foregoing allegations," Compl. ¶ 65.  Counts II and III do not depend upon amenability of GAO's actions to review under the APA.

over eligibility determinations, including for lump sum catch-up payments; nor did the Fairness Act authorize the Comptroller General to impose new eligibility requirements.[8]

A.  Begin with the text of the statute.  It provides that "the Special Master shall authorize lump sum catch-up payments from the reserve fund . . . in amounts equal to the amounts described in subclauses (I) and (II) of clause (iii)."  34 U.S.C. § 20144(d)(4)(D)(iv)(II). Clause (iii), in turn, provides that the Comptroller General "*shall submit* [to Congressional committees and the Special Master] *a report* that includes the *determination* of the Comptroller General on . . . (II) *the amount* of the proposed lump sum catch-up payment *for each 1996 Khobar Towers bombing victim*."  34 U.S.C. §§ 20144(d)(4)(D)(iii)(I), (II) (emphases added). Taken together, these two provisions—clauses (i) and (iii)—*obligated* the Comptroller General to determine and report the amount of the proposed lump sum catch-up payments "for each" individual in the two statutorily-defined groups.

The Special Master, in turn, was *obligated* to "*authorize lump sum catch-up payments . . . in amounts equal to [those] amounts."*  34 U.S.C. § 20144 (d)(4)(D)(iv)(II) (emphasis added). In other words, text of the statute sets forth *what* the Comptroller General was required to report—his "determination" on "the amount of the proposed lump sum catch-up payment"—and *for whom*—"each 1983 Beirut barracks bombing victim" and "each 1996 Khobar Towers bombing victim."

---

[8] The Fairness Act "left Fund application procedures and eligibility determinations in the discretion of the Special Master."  Ex. A, at 5.  And "[t]he Special Master determines the eligibility of each claim's application once." *Id*. at 3.  In DOJ's view, "[t]here were no separate or distinct eligibility or application procedures for these [lump sum catch-up payments]."  *Id*. at 5; *see also* FAQ 7.1 ("Claimants do not need to file additional or separate applications for lump sum catch–up payments.  Each claimant has one claim before the USVSST Fund for all compensation, including lump sum catch-up payments.").

The word "proposed" in this phrase does not by any means authorize the Comptroller General to pick-and-choose among the individuals within the two statutorily-defined groups that Congress identified (and who the Special Master had already determined to have eligible claims).[9]  Once again, the Court need not look beyond DOJ's own contemporaneous statements for confirmation that Plaintiffs' reading is correct.[10]  But it is the text of the Fairness Act that is dispositive.  It defines "1996 Khobar Towers bombing victim," to include "a plaintiff . . . *who has an eligible claim under subsection (c)* that arises out of the June 25, 1996 bombing of the Khobar Tower housing complex in Saudi Arabia."  34 U.S.C. § 201440(16)(A) (emphasis added).  Subsection (c) could not be clearer that eligibility determinations (including whether applications are timely filed) are the Special Master's exclusive responsibility:

> For the purposes of [Section 20144], a claim is an eligible claim if the *Special Master* determines that [the statutory criteria are met].

*Id.* §§ 20144(c)(1)(A)-(C) (emphasis added).  Thus, the very legislation that created the lump sum catch-up payments defined mandatory recipients of those payments by express reference to the Special Master's determination of eligibility in subsection (c).  This is powerful evidence that the Special Master's determinations that Plaintiffs' claims were eligible, Compl. ¶ 32-37, were

---

[9] The word "proposed" reflects that the Fairness Act created a multi-step process, in which the Comptroller General was first required to make a proposal through an abbreviated notice and comment process.  *See* 34 U.S.C. §§ 20144 (d)(4)(D)(i), (ii); Ex. B, Appx. II, III.  But the Comptroller General's report to Congress and the Special Master—which triggered the Special Master's obligation to authorize payments—was required to set forth his "determination" on the "amount" of the proposed payments for "each" identified victim, after allowing the opportunity for public comment.  *See* 34 U.S.C. §§ 20144 (d)(4)(D)(iii)(I), (II).

[10] "Ultimately, the statute directs GAO to include in its final report a determination of the amount of the proposed lump sum catch-up payment 'for each' 1983 Beirut barracks bombing victim and 1996 Khobar Towers bombing victim."  Ex. A at 9 (citing 34 U.S.C. §§ 20144(d)(4)(D)(iii) (I), (II)).  It is undisputed that the Plaintiffs are 1996 Khobar Towers bombing victims as defined in the Fairness Act.  *See* Compl. ¶¶ 32-37; 34 U.S.C. § 20144(j)(16).

"final" and not subject to amendment by GAO.  *See also Justice for United States Victims of State Sponsored Terrorism Act*, 81 Fed. Reg. 45,535, 45,537 (July 14, 2016).

The Fairness Act required the Special Master to follow the Comptroller General's determinations *only* with regard to "amounts equal to the amounts" described in the statute.  The formulation "amounts equal to the amounts" did not override the Special Master's exclusive authority over eligibility determinations or empower the Comptroller General to create new ones.  As DOJ put it: "[t]he Special Master determines the eligibility of each claim's application once," Ex. A at 3, and the Fairness Act "left Fund application procedures and eligibility determinations in the discretion of the Special Master," *id*. at 5.  "There were no separate or distinct eligibility or application procedures for these [lump sum catch-up payments]."  *Id*.  Consistent with DOJ's contemporaneous statements, the correct reading is that Congress delegated to GAO the computation of the *amounts* of lump sum catch-up payments, but left eligibility determinations to the Special Master.

The Comptroller General was therefore *required* to compute proposed lump sum catch-up payment amounts for each of the Plaintiffs.  And he did so, Compl. ¶ 53, even if he erroneously believed as a matter of statutory interpretation that the Fairness Act did not permit those payments to be authorized by the Special Master.  But the Comptroller General's view as *to whom* the Special Master was obligated to authorize payments—as opposed to *the amounts* of those payments—did not affect the Special Master's statutory obligation.

Counts II & III ask the Court to declare that 34 U.S.C. §§ 20144(d)(4)(D)(iii)(I), (II) require the Special Master to authorize their lump sum catch-up payments in the amounts computed by the Comptroller General, and to order that the Special Master do so.

B.  Defendants suggest that the Special Master's hands were tied because GAO did not "propose" the amount of Plaintiffs' lump sum catch-up payments.  Defs.' Mot. at 14-15.  This suggestion is pure semantics and of no legal significance.  GAO computed and reported the precise amounts of Plaintiffs' lump sum catch-up payments using exactly the same methodology that it used for all claimants.  *See* Compl. ¶ 31.  And the Special Master's financial reporting treats the amounts computed by the Comptroller General for those *who were* authorized payments on equal footing with the amounts computed by the Comptroller General for the Plaintiffs and the other 272 similarly-situated claimants *who were not* authorized payments.[11] The amounts computed for Plaintiffs' payments were not "hypothetical" or "theoretical" in the sense that there are no additional computations to be performed, facts to be gathered, or discretion to be exercised.  *See* Ex. B at 20.  The GAO's puzzling belief that Congress intended to require claimants to resubmit applications that had already been accepted, reviewed, and conclusively deemed eligible by the Special Master would amount to the epitome of "empty paper shuffling."  *Parrish v. United States*, 145 S. Ct. 1664, 1672 (2025) (cleaned up).  DOJ recognized as much in concluding that there was no rational reason to require a second application:  Using previously-collected information provided in the original applications, "GAO was able to calculate [a lump sum catch-up payment] even for the 274 claimants who did not make a successive application . . . ."  Ex. A at 7; *see also id.* at 9 (noting that "the GAO nevertheless has calculated the LSCUPs for these claimants and included that amount in the draft Report").

---

[11] *See USVSST Financial Report*, https://www.usvsst.com/Home/FundBalance (last updated Mar. 31, 2025) (reporting the amount that GAO "calculated for 274 claimants who GAO determined were not eligible to receive [Beirut bombing/Khobar Towers lump sum catch-up payments.").

Moreover, the purpose of the Fairness Act—as evidenced by its text—is inconsistent with Defendants' *post-hoc* litigation position.  It was intended to benefit the two groups of victims defined in the statute by *extending* the deadline to apply and providing *additional* one-time payments to them.  Defendants' reading of the statute, which penalizes members of these groups who timely applied before the Fairness Act was enacted, is irreconcilably at odds with its text, structure, and purpose.  *See Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 706 (D.C. Cir. 1971) ("Remedial legislation is traditionally construed 'broadly to effectuate its purposes . . . .'"  (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).  Defendants would arbitrarily exclude members of the two statutorily-defined groups who did everything the statute and the Special Master required:  they timely applied before the statute was enacted and followed the Special Master's application procedures to a tee.[12]  Defendants offer no reason Congress would intend such an unprincipled process or arbitrary result as to "a small group of particularly deserving claimants."  *Soto v. United States*, 145 S. Ct. 1677, 1687 (2025).[13]

GAO's incorrect opinion regarding eligibility is of no legal effect, and it presents no factual or legal impediment to the Special Master fulling her obligation to authorize payments in amounts that GAO determined and reported.

---

[12]  Existing Special Master guidance made clear that no duplicative applications were permitted or required.  Ex. A at 5; FAQ 7.1.  Indeed, GAO's new application requirement was first announced over one year *after* the supposed "application window" had closed, arbitrarily leaving claimants who followed the then-existing Fund guidance with no way to qualify for catch-up payments.  Ex. A at 5.

[13] Consider the arbitrary and disparate treatment resulting from GAO's interpretation.  Certain victims—in violation of Fund procedures—resubmitted applications, but the Special Master refused to accept them.  Those applications were never acted on by Fund staff, but GAO credited them nevertheless.  Whereas 274 claimants who followed Fund procedures and guidance—which stated that resubmission was not required—were deemed by GAO to be ineligible.  This undermines the integrity of the USVSST process.

III.    **This Court Has Subject Matter Jurisdiction Over All of Plaintiffs' Claims.**

Defendants argue (Defs.' Mot. at 16-21) that the Court lacks subject matter jurisdiction over "Plaintiffs' claims against the Special Master" because such claims implicate the statute's preclusion provision (*id*. at 16-20); otherwise, Article III standing is lacking "[t]o the extent that" Plaintiffs seek relief other than "relief from their individual compensation decisions," *id.* at 21. These arguments fail for the fundamental reason that the USVSST Act does not preclude "claims against the Special Master" or even claims "seeking relief from [] individual compensation decisions," which is the premise of Defendants' jurisdictional arguments.  The USVSST Act instead precludes review of certain "decisions made by the Special Master with regard to compensation," and no such decisions are at issue here.

The only decisions placed in issue by Plaintiffs' claims were made by the Comptroller General, not the Special Master.  Defendants helpfully concede that the Special Master had no discretion with regard to whom to authorize payments.  The point of disagreement is with GAO's decree that its determination of eligibility bound the Special Master and overrode the statutory direction for her to authorize payment to "each" of the statutorily-defined claimants.  That is incorrect as a matter of law and this Court's review of the relevant statutory provisions is not precluded as a "decision made by the Special Master with regard to compensation."  Defendants' preclusion argument fails because it necessarily contorts the text of the statute beyond recognition, violating the first and most important rule of statutory construction.  Defendants' standing argument is entirely redundant of their incorrect preclusion argument.[14]

_____

[14] Defendants direct these arguments to Counts I and III, which they characterize as claims against the Special Master.  Count I, however, seeks review of GAO's interpretation of the Fairness Act, and is directed to all Defendants.  Thus, while Defendants' characterization of Plaintiffs' claims is inaccurate, it is not necessary to parse that issue because Defendants'

## A.    Plaintiffs' Claims Are Not Precluded by the USVSST Act.

As a general matter, there is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). That presumption can be rebutted, however, with "clear and convincing evidence" of a legislative intent to "restrict access to judicial review." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967) (citation omitted).  When Congress withholds review of administrative action, it withdraws the court's jurisdiction to hear claims challenging the agency's conduct. *See Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1071 (D.C. Cir. 2018); *see also* 5 U.S.C. § 701(a)(1). The Supreme Court has construed this exception to apply "only upon a showing of clear and convincing evidence of legislative intent." *Lindahl v. OPM*, 470 U.S. 768, 778 (1985) (citation omitted).  Whether and to what extent a particular statute precludes judicial review is determined based upon its express language, and also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved.  *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).

1.  The USVSST governing statute addresses "decisions made by the Special Master with regard to compensation from the Fund."  34 U.S.C. § 20144(b)(3).  All such decisions are to be "in writing" and must be "provided to the Attorney General" and "each claimant."  *Id.* § 20144(b)(3)(A).  Such decisions made by the Special Master are "final" and not subject to judicial review:

> All decisions made by the Special Master with regard to compensation from the Fund shall be—(A) in writing and provided to the Attorney General, each claimant and, if applicable, the attorney for each claimant; and (B) final and,

_____

arguments fail for more fundamental reasons that make clear the Court has jurisdiction over *all* of Plaintiffs' claims.

except as provided in paragraph (4), not subject to administrative or judicial review.

*Id.* §§ 20144(b)(3)(A)-(B) ("Decisions of the Special Master").

2. The Complaint does not challenge any "decision made by the Special Master with regard to compensation from the Fund."

Count I seeks review of the GAO's interpretation of Section 20144(d)(4)(D)(i) of the Fairness Act to create new eligibility requirements and, if determined to be incorrect or beyond GAO's statutory authority, a declaration that the Special Master is therefore required by the Fairness Act to authorize Plaintiffs' catch-up payments.[15] The GAO's interpretation of the Fairness Act is not a "decision made by the Special Master." Count I is therefore not precluded.

Count II seeks a declaration that regardless of GAO's purported interpretation, Section 20144(d)(4)(D)(i) (which governs the Comptroller General's audit and public notice obligations) has no bearing on the Special Master's non-discretionary obligation to authorize payments to "each" 1996 Khobar Towers bombing victim (including the two Plaintiffs). Count III seeks an order compelling the Special Master to fulfill that obligation. Counts II and III are not precluded because while they are directed at the Special Master's inaction, they do not involve "decisions made by the Special Master." The Special Master determined that Plaintiffs were eligible to receive payments from the Fund, and that favorable determination of eligibility extended to lump sum catch-up payments. *See* Ex. A at 3 ("The Special Master determines the eligibility of each claim's application once"); *id*. at 5 ("There were no separate or distinct eligibility or application procedures for these [lump sum catch-up payments]."). It is the Comptroller General's assertion

---

[15] This is the central issue in Count I that Defendants avoid addressing on the merits.

of authority to dictate to whom the Special Master was to authorize payments that is at issue, and that is not a "decision made by the Special Master."

There are two predicate decisions that triggered the Special Master's mandatory "shall authorize" obligation. *First*, the Special Master determined that each Plaintiff is eligible to receive compensation from the Fund under subsection (c) of the statute, including the lump sum catch-up payments at issue here. Compl. ¶¶ 35-36, 39. Judicial review of such determinations may well be precluded by the statute as "decisions made by the Special Master with regard to compensation." But that is of no consequence because those determinations were made in favor of the Plaintiffs and the Court is not asked to review them.

*Second*, the Comptroller General computed the amount of each Plaintiffs' lump sum catch-up payment. *Id.* ¶ 53. Plaintiffs also do not challenge—and do not ask the Court to review—the amounts of their payments as computed by the Comptroller General.

Those two *unchallenged* predicate determinations—the Special Master's eligibility determination and the Comptroller General's calculation of payment amounts—triggered the requirement that "the Special Master *shall authorize* lump sum catch-up payments." 34 U.S.C. § 20144(d)(4)(D)(iv)(II) (emphasis added). Congress' use of the word 'shall' demonstrates that [the statute] mandates [the action]." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016). Indeed, Defendants concede that the Special Master had no discretion with regard to her authorization of lump sum catch-up payments: "those [lump sum catch-up] payment authorizations were executed without discretion." Defs.' Mot. at 17.

Defendants' concession in this regard is dispositive of their preclusion and standing arguments. "Where there is room for policy judgment and decision there is discretion." *Dalehite v. United States*, 346 U.S. 15, 36 (1953). Conversely, where an agency action is

27

"executed [or not] without discretion," Defs.' Mot. at 17, there is no "decision made by the Special Master" that would implicate the statute's preclusion provision. Authorization of payments by the Special Master after those predicate decisions were made is not a "decision made by the Special Master," it is a non-discretionary obligation. The Special Master's failure to comply with a non-discretionary statutory obligation is reviewable. This concept is so fundamental it is found at the core of one the Supreme Court's most fundamental early decisions. *See Marbury v. Madison*, 1 Cranch 137, 167 (1803) (explaining that the President's nomination and appointment of officers of the United States are unreviewable political acts, but once nominated and appointed an individual has acquired rights "protected by the law" and "he has the privilege of asserting them in like manner as if they had been derived from any other source.").

The Special Master's failure to comply with her "shall authorize" obligation after the predicate discretionary determinations were made is therefore actionable under the APA. *See, e.g.*, *Cayuga Nation v. United States*, 594 F. Supp. 3d 64, 73 (D.D.C. 2022) (holding that had the agency determined that plaintiff met the statutory requirements and then refused to grant its application "that would amount to unlawful withholding of a non-discretionary act."). Put differently, the only agency action at issue in Counts II and III is the Special Master's failure to carry out her obligation to authorize payment of *undisputed amounts determined by a different agency* for claimants and claims *she already determined to be eligible*.

Accordingly, none of the Complaint's counts are precluded. *Cf. Soto*, 145 S. Ct. at 1682 (explaining that it is a "well-established principle that in the Government-claims context, when the Government determines that a claim is valid, the claim should be paid in full.") (cleaned up).

3.  If Congress intended to do what Defendants argue—preclude judicial review of any "claims against the Special Master"—it would not have limited preclusion to certain (not even all) "decisions made by the Special Master." 34 U.S.C. § 20144(b)(3).  It would not even have been enough for Congress to preclude "all claims against the Special Master"—as Defendants repeatedly over-read the scope of preclusion here, Defs.' Mot. at 1, 9, 16—because that leaves claims against the Comptroller General unaffected.  In order to accomplish what Defendants desire, Congress would have had to enact a much broader provision.  For example:  "any claims arising under the USVSST Act, as amended, are not subject to judicial review."  Congress knows how to write exactly such a provision when it intends the result that Defendants seek here.  *See, e.g.*, *Heckler v. Ringer*, 466 U.S. 602 (1984).  But it chose not to do so in the Fairness Act.

In *Ringer*, the Supreme Court considered a preclusion statute that covered all claims "arising under" the Medicare Act.  *Id*. at 605.  The Supreme Court construed "arising under" to broadly preclude "any claims in which both the standing and the substantive basis for the presentation of the claims is" based upon the statute at issue.  *Id*. at 615 (cleaned up).  Granted, that sounds a lot like Defendants' arguments here.  But rather than support their cause, the similarity of Defendants' arguments to *Ringer*'s discussion undercuts their position because the USVSST preclusion provision is very different (and much narrower) than the one at issue in *Ringer*.  Defendants' reliance on *Heckler v. Ringer*, Defs.' Mot. at 19-20, demonstrates that they are seeking to expand USVSST preclusion beyond the statutory language enacted by Congress.

The Supreme Court's reasoning in *Heckler v. Ringer* explains why Defendants are wrong to attempt to do so here.  The metes and bounds of any preclusion provision are first measured against the text of the statute.  *Ringer,* 466 U.S. at 615 (observing that "to be true to the language of the statute, the inquiry in determining whether [the statute] bars federal-question jurisdiction

must be whether the claim 'arises under' the Act"). Thus, the *Ringer* Court's conclusion that claims "inextricably intertwined" with Medicare benefits were barred flowed directly from the text of the statute broadly precluding claims "arising under" the Medicare Act. *Id.* at 614-16 (citation omitted).

Contrary to Defendants' undeveloped assertion, Defs. Mot. at 12 n.6, 20, *Ringer* and its "inextricably intertwined" test have no application whatsoever to the narrower preclusion provision here.[16] Rather, to be true to the statutory text at issue here this Court must ask a different question: do the claims seek review of *a decision made by the Special Master with regard to compensation*? The answer is no. Indeed, Defendants concede that it is the Comptroller General (acting through GAO)—not the Special Master—that made the "unequivocal determination that lump sum catch-up payments could not be proposed for Plaintiffs . . . ." Defs. Mot. at 15. The well-established presumption of judicial review dictates that the scope of preclusion is precisely delimited by the statute's express language, structure, purpose, and other contextual clues analyzed above. Defendants' argument runs afoul of that basic principle at step one because Defendants must effectively rewrite the language of the statute to obtain the result they seek.

4. In *Braun v. United States*, 31 F.4th 793 (D.C. Cir. 2022), the D.C. Circuit reached the merits of a claim (like Counts II and III here) pertaining to the Special Master's "shall authorize"

---

[16] Defendants' initial motion to dismiss included a section arguing that any issue "inextricably intertwined" with compensation would be precluded. *See* ECF No. 19, at 19-20. Defendants have affirmatively waived this argument (which at any rate is incorrect for the reasons explained above) by affirmatively omitting it from their current brief. And even if Defendants' initial brief is not considered, the remnants of this argument in the current brief are insufficiently developed and it is therefore forfeited. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work." *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (cleaned up).

obligation. *Braun* is a case that was brought by a USVSST claimant seeking, in part, to compel the Special Master to more frequently "authorize" regular distributions under a parallel "shall authorize payment" provision.[17]  In the district court, the government argued that "because Plaintiff is fundamentally seeking review of the Special Master's decision regarding his compensation from the Fund, Plaintiff's claims are precluded from judicial review by the express terms of the Act." *Braun v. United States*, Case 20-cv-2613 (D.D.C. Nov. 24, 2020), ECF No. 9, at 13-14.  If that had been correct, Braun's claims regarding the timing and frequency of the Special Master's authorization of payments would have been precluded.  The district court noted, however, that an "expansive reading" of the preclusion provision to bar any claim that "may yield an increased payout" would "not respect the strong presumption in favor of judicial review." *Braun v. United States*, 531 F. Supp. 3d 130, 135 (D.D.C. 2021) (cleaned up).  The district court ultimately "sidestep[ed]" the preclusion issue altogether and assume statutory jurisdiction. *Id.* at 136.  But on appeal, not only did the D.C. Circuit reach the merits without qualification, the government abandoned any argument that plaintiff's claims were precluded.[18]  Defendants' broad reading of the preclusion provision here is flatly inconsistent with the D.C.

---

[17] The clause at issue in *Braun* provides in relevant part: "[I]f funds are available in the Fund, the Special Master *shall authorize additional payments* on a pro rata basis to those claimants with eligible claims under subsection (c)(2) and shall authorize additional payments for eligible claims annually thereafter if funds are available in the Fund."  34 U.S.C. § 20144(d)(4)(A) (emphasis added).

[18] *See* Brief for Appellees, *Braun v. United States*, No. 21-5088 (D.C. Cir. Dec. 01, 2021).  On the merits, the D.C. Circuit rejected the interpretation of the "shall authorize payment phrase" advanced by the Plaintiff ("actually pay money") and the government ("determining eligibility") and suggested instead that this phrase captures the ministerial step of issuing "a notice allocating a specific payment amount for distribution." *Braun v. United States*, 31 F.4th 793, 800 (D.C. Cir. 2022).

Circuit's resolution of *Braun*, as well as the government's own arguments on appeal. Like the D.C. Circuit in *Braun*, this Court should reach the merits of Plaintiffs' claims.

5. Defendants vaguely advert to an unidentified "decision about the availability or (unavailability) of certain types of compensation to certain claimants," but they fail to identify any such decision (as opposed to statutory obligation) made by the Special Master (as opposed to the Comptroller General or GAO) that is challenged by Plaintiffs. Defs.' Mot. at 17. As explained above, once the *unchallenged* predicate determinations were made (involving one set of determinations by the Special Master and one set by the Comptroller General), the Special Master's duty to authorize the payments was mandatory (a point that Defendants concede, *id.*) and therefore involved no further decision-making. And because Defendants disclaim reliance on an administrative record, ECF No. 23 at 2, Defendants cannot rely on an unidentified phantom "decision" that lurks beyond the four corners of the Complaint to prevent the case from proceeding to the merits.

6. The other authorities cited by Defendants do not help their cause either. *Hekmati* and *O'Neill* are clearly distinguishable because they involve decisions made by the Special Master, not other officials or agencies. *See Hekmati v. United States*, 153 Fed. Cl. 800, 811-12 (2021) (factual challenge to *Special Master*'s eligibility determination), *aff'd*, 51 F.4th 1066 (Fed. Cir. 2022); *O'Neill v. Garland*, 2022 WL 17415057, at *3-7 (D.D.C. Dec. 5, 2022) (Boasburg, J.) (challenge to *Special Master*'s decisions regarding regular distribution amounts).

In *Hekmati v. United States ("Hekmati II")*, the plaintiff directly challenged the Special Master's written decision finding that the plaintiff was ineligible for benefits. 51 F.4th 1066 (Fed. Cir. 2022). Hekmati sued after being afforded the hearing provided for in Section 20144(b)(3)(4). The Federal Circuit concluded that the Special Master's reconsideration

decision finding the plaintiff ineligible based upon the criteria in subsection (c) of the statute was within the scope of the preclusion provision.  51 F.4th at 1072.  That holding is neither surprising nor helpful to Defendants here.  What is pertinent here is that Hekmati refiled in district court under the APA to challenge the *sufficiency of the procedures* that the Special Master afforded him during his administrative hearing.  *Hekmati v. United States* ("*Hekmati III*"), Case No. 23-cv-3774 (D.D.C.).  Notably the government has *not* argued that Hekmati's procedural challenge is precluded by the statute even though his ultimate goal, of course, is to receive compensation from the Fund.[19]

In *O'Neill v. United States*, the plaintiff challenged "the method for calculating payments devised by the Special Master of the Fund."  2022 WL 17415057, *1 (D.D.C. 2022).  The district court deemed preclusion to be expansive with regard to *decisions made by the Special Master* (which are not at issue here), but its holding expressly did not extend beyond plaintiffs' focused challenge to the Special Master's methodology for calculating payments.  *Id*. at *5 (explaining that the "Court need not venture further in deciding the outer limit of the Special Master's decisions that lie beyond judicial review" and limiting its holding to decisions made by the Special Master regarding "payment and eligibility" and her "decisions regarding the methodology for calculating payments.").  As explained above, no such decisions are at issue here; it was the Comptroller General, not the Special Master, who purported to decide that payments would not be authorized for Plaintiffs.

---

[19] *See* Case No. 23-cv-3774 (D.D.C. April 28, 2025), ECF No. 21-1, at 1 ("Plaintiff does not, and cannot, challenge the merits of the Special Master's decision regarding his eligibility to receive compensation from [the Fund]. So instead, Plaintiff asserts that he is entitled to confront and cross-examine confidential [FBI] sources in an administrative proceeding.").

*Schneider v. Feinberg*, 345 F.3d 135 (2d Cir. 2003) (per curiam), involved a different compensation program with a similar preclusion provision.  But the Second Circuit reached the *merits* of two of the four issues presented.  The issues that *were not* precluded are most relevant here: (1) whether the Special Master violated the statute by imposing a *de facto* cap on compensation, *id*. at 144; and (2) whether the Special Master "adopted a permissible interpretation of the Act that is entitled to deference [under the now-overruled *Chevron* standard]," *id*. at 148.  The Court also expressed willingness to reach the merits of a third issue— whether a cap on compensation would violate the governing statute.  *Id.* at 143.  The *only* issue the Second Circuit found to be precluded was the Special Master's determination of individual compensation amounts, *id*. at 145, 148, which is not at issue here.  *Schneider*, therefore, adopts an issue-by-issue approach focused on decisions made by the Special Master, and as a result *Schneider* undermines Defendants' overbroad reading of USVSST preclusion.

7.  Two recent USVSST cases that Defendants do not discuss—*Englehardt v. Garland*, 759 F. Supp. 3d 112 (D.D.C. 2024) and *Campuzano v. United States*, Case No. 24-cv-01652 (D.D.C.)— also are inconsistent with Defendants' attempt to expand the scope of preclusion to encompass decisions made by an official or agency other than the Special Master.  The claims in those cases would be precluded if the USVSST statute precluded claims that have the effect of increasing payments to plaintiffs from the Fund.  But in *Englehardt* the district court reached the merits of such claims and in *Campuzano* the government has not argued USVSST preclusion.

\*     \*     \*

The pertinent authorities discussed above support the conclusion that Plaintiffs' claims here are *not* precluded, and this Court should reach the merits.  The D.C. Circuit in *Braun* and the Second Circuit in *Schneider* reached the merits of claims that are analogous in certain critical

jurisdictional respects to those brought by Plaintiffs here. The Federal Circuit decision in *Hekmati II* and the district court decision in *O'Neill* stand for the unremarkable (and inapplicable) proposition that decisions made by the Special Master about eligibility and amount of compensation are precluded. *Ringer* interprets a much broader statutory provision that precludes any claims "arising under" the Medicare statute, and that Supreme Court decision only illustrates that Defendants dramatically over-read the statutory language here.

In sum, all of Defendants' authorities (and two additional authorities ignored by Defendants) are uniformly supportive of Plaintiffs' reading of the preclusion provision and inconsistent with Defendants' overbroad reading.

### B.    Plaintiffs Have Established Article III Standing.

Plaintiffs' claims are supported by allegations establishing each element necessary for Article III standing. *See Humane Soc'y of U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015). Plaintiffs have alleged *injury-in-fact* (failure to authorize payment); *traceability* (Defendants' misinterpretation of, and failure to comply with, their statutory obligations are the direct causes of Plaintiffs' injuries); and *redressability* (the Complaint seeks an order declaring Defendants' statutory obligations and compelling Defendants' compliance with those obligations). For example:

> By law, the Special Master was required to take the ministerial step of allocating payment to the Plaintiffs in the amounts determined by the Comptroller General by "authorizing" such payment. The Special Master failed to authorize payment to Plaintiffs in violation of the Fairness Act. The Special Master's failure to act has caused Plaintiffs to suffer legal wrong. Plaintiffs seek an order compelling this agency action, which has been unreasonably and unlawfully withheld.

Compl. ¶ 40; *see also id.* ¶¶ 34-37, 39, 42, 51-55, 65-73.

Defendants argue that because (in their misguided view) certain claims are precluded, those claims are not redressable and Plaintiffs lack standing to bring them. Defs.' Mot. at 21. But that

circular argument misconstrues the nature of the Article III inquiry and is entirely duplicative of Defendants' preclusion argument. If the Court were to find certain claims to be precluded, those claims would fail for lack of statutory standing, not Article III standing. *See Braun*, 531 F. Supp.3d at 136 (sidestepping the preclusion issue to assume "statutory jurisdiction" even though the Court would not be able to do so if preclusion implicated "constitutional jurisdiction"). On the other hand, if the Court finds that Plaintiffs' claims are not precluded, there is nothing left of Defendants' standing argument.

## IV.    Plaintiffs' Alternative Claim Against the Special Master Is Cognizable (Count IV).

Count IV alleges in the alternative that if the Fairness Act required Plaintiffs to submit duplicative applications (or GAO's determination to that effect is conclusive), the Special Master acted unlawfully by failing to update fund procedures and guidance to allow for the submission of such applications. Compl. ¶ 75.

The Fairness Act required the Special Master to update her procedures and guidance as necessary as a result of the Fairness Act:

> Not later than 30 days after the date of enactment of the [Fairness Act], the Special Master *shall update*, as necessary as a result of the enactment of such Act, such procedures and other guidance previously issued by the Special Master.

34 U.S.C. § 20144(b)(2)(A) (emphasis added).

"Shall update" signals a mandatory duty on behalf of the Special Master to make updates if the conditions set forth are satisfied. *See Kingdomware Techs.,* 579 U.S. at 171. "As necessary as a result of the enactment" means that the Special Master must act if the Fairness Act makes changes to the law that must be accommodated by changes to procedure or guidance. "Not later than 30 days" is the timeframe the Special Master was given to comply with the command to update.

Case 1:25-cv-00292-LLA    Document 25    Filed 07/14/25    Page 42 of 54

The Special Master cannot have it both ways. If the Special Master is bound by GAO's determination that the Fairness Act both permitted and required duplicative applications for certain claimants to be eligible for lump sum catch-up payments (as Defendants argue in this Court, Defs.' Mot. at 14-16),[20] then the Special Master had a concomitant statutory obligation to update her procedures to accept such duplicative applications consistent with GAO's interpretation of the statute.[21] In that case the Court should declare that the Special Master violated the statute by failing to update her procedures to accept duplicative applications, and order her to comply as requested in Count IV, Compl. ¶¶ 76 (declaration), 77 (order). If on the other hand the Special Master is *not* bound by the Comptroller General's interpretation of the Fairness Act, the Court can and should declare that the Special Master is obligated by the Fairness Act to authorize payments to the Plaintiffs and order her to comply with that non-discretionary duty.

There is no question that under GAO's interpretation of the Fairness Act an update to Fund procedures and guidance was "necessary." The Special Master's procedures and guidance in December 2022 expressly *prohibited* claimants from submitting duplicative applications and made clear that the Special Master would not accept them.[22] This is a clear conflict between the

---

[20] *See* Defs.' Mot. at 14 ("The Act dictates that the Special Master make lump sum catch-up payments only in the amounts and *to the individuals proposed in the GAO Report—providing the Special Master with no discretion* as to alter or adjust the amount of those payments.") (emphasis added).

[21] According to GAO, the Fairness Act *required* and *permitted* duplicative applications. *See* Ex. B at 18-19 ("[I]ndividuals must have submitted [a duplicative] application to be eligible for [lump sum catch-up payments] under the Fairness Act."); *id*. at 6 (stating the Fairness Act "permitted [such victims] to submit duplicate or successive applications").

[22] Ex. A at 6; *see also Justice for United States Victims of State Sponsored Terrorism Act*, 81 Fed. Reg. 45,535, 45,537 (July 14, 2016); FAQ 7.1 ("Claimants do not need to file additional or separate applications for lump sum catch–up payments. Each claimant has one claim before the

37

Fairness Act (as interpreted by GAO) and the Special Master's procedures and guidance. That is precisely what Congress required the Special Master to resolve in favor of the Fairness Act by providing that the Special Master "shall update" those program documents "as necessary."

Defendants' arguments, Defs.' Mot. at 21-23, are nonsensical. The statutory provision at issue creates a conditional statutory obligation—triggered by conflict between the Fairness Act and fund procedures and guidance—that requires the Special Master to act within 30 days. But Defendants attempt to argue—without authority—that this provision should be understood to confer *discretion* that expires after 30 days. If that is what Congress intended, the provision would read: "The Special Master *may* update such procedures and other guidance, but *shall* do so no later than 30 days after enactment." Defendants' argument once again clearly contradicts the plain text that Congress enacted.

Defendants' arguments also are inconsistent with the Special Master's past practices in suggesting that she lacks authority to modify her procedures and guidance outside of the 30-day window. The Special Master has periodically and regularly updated fund guidance in the form of frequently asked questions ("FAQs"), including with regard to the special lump sum catch-up payments at issue as recently as January 31, 2025, more than two years after the 30-day period expired.[23] While fund procedures have not been updated since their initial issuance in 2016, the Fairness Act treats updates to fund "procedures" on equal footing with updates to "other guidance." *See* 34 U.S.C. § 20144(b)(2)(A). Thus, the Special Master's routine and periodic

---

USVSST Fund for all compensation, including lump sum catch-up payments. The USVSST Fund cannot accept duplicative filings.").

[23] *See* FAQ 7.2 ("On January 31, 2025, the USVSST Fund began informing eligible victims of the 1983 Beirut barracks bombing and the 1996 Khobar Towers bombing of their GAO-determined lump sum catch-up payment amounts, and continues issuing these payments on a rolling basis.").

updating of "other guidance" refutes her interpretation that this provision of the Fairness Act limited her discretion to update Fund procedures outside of a 30-day window.  Defendants' "post hoc rationalizations for agency action" should not be credited.  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (emphasis omitted).  That is particularly true here because Defendants' litigation position is contradicted by the statute's plain text, contemporaneous statements, and agency practice.

Defendants' argument that it is too late for the Court to grant relief is even further afield. Congress has empowered this Court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The Special Master's mandatory action to change her procedures and guidance was unlawfully withheld and unreasonably delayed when the Special Master failed to comply within 30 days.  That was the period in which the *Special Master* was required to act, not a deadline for the *Court* to order relief.[24]

Defendants also suggest in passing that Count IV is precluded.  That is incorrect because, as discussed above, the Special Master's "shall update" obligation, once triggered, provided her no discretion and therefore involved no "decision made by the Special Master" and certainly was not "with regard to compensation."  It also is inconsistent with the government's position in *Hekmati III*, in which it defended fund procedures on the merits and did *not* argue that such a challenge was precluded.  *See supra* note 19.  Count IV is not precluded as a "decision[] made by the Special Master with regard to compensation."

---

[24] *Beberman v. Blinken*, 61 F.4th 978, 983 (D.C. Cir. 2023), is not remotely helpful to Defendants because (1) Defendants are wrong that the Fairness Act *removed* the Special Master's authority to update procedures and other guidance after 30 days; and (2) *Beberman* does not purport to limit a Court's ability to correct violation of a non-discretionary statutory *obligation*.  Additionally, *Beberman* makes clear that the different outcomes in *Beberman* and *Miller v. Baker*, 969 F.2d 1098, 1100 (D.C. Cir. 1992), turned on details of the grievance system established for foreign service officers, and not any relevant overarching principle of law.

**V.     The Court Should Not Dismiss Count V, Which Seeks an Order Preserving Necessary Funds.**

Defendants incorrectly argue that Count V of Plaintiffs' complaint should be dismissed because the parties have entered into a joint stipulation preserving the funds at issue. Defs.' Mot. at 23-24. The joint stipulation generally preserves funds "for the duration of the litigation before this Court," absent prior notice. ECF No. 15, Joint Stip. ¶ 8. Nevertheless, the joint stipulation acknowledges the possibility that Defendants still could on 21-days' notice take an action "that would leave less than the amount which Plaintiffs seek in this lawsuit," prompting Plaintiffs "to move the Court for appropriate injunctive relief" later. *Id.* ¶ 9. And absent further agreement and stipulation, an injunction will be necessary to preserve funds during the pendency of any appeals. For these reasons, Plaintiffs continue to pursue injunctive relief under Count V. *See Roman Cath. Diocese v. Cuomo*, 592 U.S. 14, 20 (2020) (per curiam) (entering an injunction because the applicants remained under threat that defendant could reinstate the challenged classification).

## CONCLUSION

The Court should deny Defendants' motion to dismiss in its entirety.


Dated: July 14, 2025                                Respectfully Submitted,
                                                    WILLIAMS & CONNOLLY LLP


                                                    /s/F. Greg Bowman
                                                    F. Greg Bowman (D.C. Bar No. 486097)
                                                    Edward C. Reddington (D.C. Bar No. 463507)
                                                    680 Maine Avenue, SW
                                                    Washington, DC 20024
                                                    (202) 434-5000

                                                    *Attorneys for Plaintiffs*

APPENDIX A
EXCERPTED USVSST STATUTORY PROVISIONS

## TITLE 15, SECTION 20144

(a) SHORT TITLE

This section may be cited as the "Justice for United States Victims of State Sponsored Terrorism Act."

(b) ADMINISTRATION OF THE UNITED STATES VICTIMS OF STATE SPONSORED TERRORISM FUND

(1) ADMINISTRATION OF THE FUND

(A) Appointment and terms of Special Master

(i) Initial Appointment

    *    *    *

(ii) Additional terms

    *    *    *

(iii) Special Master to administer compensation from the Fund

The Special Master shall administer the compensation program described in this section for United States persons who are victims of state sponsored terrorism.

(B) Administrative costs and use of Department of Justice personnel

    *    *    *

(C) Compensation of Special Master

    *    *    *

(2) PUBLICATION OF REGULATIONS AND PROCEDURES

(A) In general

Not later than 60 days after the date of the initial appointment of the Special Master, the Special Master shall publish in the Federal Register and on a website maintained by the Department of Justice a notice specifying the procedures necessary for United States persons to apply and establish eligibility for payment, including procedures by which eligible United States persons may apply by and through their attorney. Not later than 30 days after the date of enactment of the United States Victims of State Sponsored Terrorism Fund Clarification Act, the

Appx-1

Special Master shall update, as necessary as a result of the enactment of such Act, such procedures and other guidance previously issued by the Special Master. _Not later than 30 days after the date of enactment of the Fairness for 9/11 Families Act, the Special Master shall update, as necessary as a result of the enactment of such Act, such procedures and other guidance previously issued by the Special Master. Such notice and any updates to that notice or other guidance are not subject to the requirements of section 553 of title 5_.

**(B)  Information regarding other sources of compensation**

\*    \*    \*

**(3)  DECISIONS OF THE SPECIAL MASTER**

_All decisions made by the Special Master with regard to compensation from the Fund shall be_—

(A) _in writing and provided to the Attorney General, each claimant and, if applicable, the attorney for each claimant_; and

(B) _final and, except as provided in paragraph (4), not subject to administrative or judicial review_.

**(4)  REVIEW HEARING**

(A) Not later than 30 days after receipt of a written decision by the Special Master, a claimant whose claim is denied in whole or in part by the Special Master may request a hearing before the Special Master pursuant to procedures established by the Special Master.

(B) Not later than 90 days after any such hearing, the Special Master shall issue a final written decision affirming or amending the original decision. The written decision is final and nonreviewable.

**(c)  ELIGIBLE CLAIMS**

**(1)  IN GENERAL**

For the purposes of this section, a claim is an eligible claim if the Special Master determines that—

(A)  the judgment holder, or claimant, is a United States person;

(B)  the claim is described in paragraph (2); and

(C)  the requirements of paragraph (3) are met.

**(2)  CERTAIN CLAIMS**

The claims referred to in paragraph (1) are claims for—

    (A)  compensatory damages awarded to a United States person in a final judgment—

        (i)  issued by a United States district court under State or Federal law against a foreign state that was designated as a state sponsor of terrorism at the time the acts described in clause (ii) occurred or was so designated as a result of such acts; and

        (ii) arising from acts of international terrorism, for which the foreign state was determined not to be immune from the jurisdiction of the courts of the United States under section 1605A, or section 1605(a)(7) (as such section was in effect on January 27, 2008), of title 28;

    (B)  [Iranian hostages 1979-1980]

    (C)  [spouses and children of the former hostages described in subparagraph (B)]

**(3)  DEADLINE FOR APPLICATION SUBMISSION**

    **(A)  In general**

The deadline for submitting an application for a payment under this subsection is as follows:

        (i)  Not later than 90 days after the date of the publication required under subsection (b)(2)(A), with regard to an application based on—

            (I)     a final judgment described in paragraph (2)(A) obtained before that date of publication; or

            (II)    [pertaining to Iranian hostages and their spouses and children]

        (ii) *Not later than 90 days after the date of obtaining a final judgment, with regard to a final judgment obtained on or after the date of that publication, unless*—

            (I)     the final judgment was awarded to a 9/11 victim, 9/11 spouse, or 9/11 dependent before November 21, 2019, in which case such United States person shall have 90 days from the date of enactment of such Act to submit an application for payment; or

            (II)    *the final judgment was awarded to a 1983 Beirut barracks bombing victim or a 1996 Khobar Towers bombing victim before December 29, 2022, in which case such United States person shall have 180 days from December 29, 2022, to submit an application for payment.*

**(B)  Good cause**

For good cause shown, the Special Master may grant a claimant a reasonable extension of a deadline under this paragraph.

**(d)  PAYMENTS**

**(1)  TO WHOM MADE**

The Special Master shall order payment from the Fund for each eligible claim of a United States person to that person or, if that person is deceased, to the personal representative of the estate of that person**.**

**(2)  TIMING OF INITIAL PAYMENTS**

The Special Master shall authorize all initial payments to satisfy eligible claims under this section not later than 1 year after December 18, 2015**.**

**(3)  PAYMENTS TO BE MADE PRO RATA**

*  *  *

**(4)  ADDITIONAL PAYMENTS**

**(A)  In general**

Except as provided in subparagraph (B), (C), and (D), on January 1 of the second calendar year that begins after the date of the initial payments described in paragraph (1) if funds are available in the Fund, the Special Master shall authorize additional payments on a pro rata basis to those claimants with eligible claims under subsection (c)(2) and shall authorize additional payments for eligible claims annually thereafter if funds are available in the Fund.

**(B)  Third round payments**

*  *  *

**(C)  Lump sum catch-up payments for 9/11 victims, 9/11 spouses, and 9/11 dependents**

**(i)  In general**

*  *  *

**(ii)  Public comment**

*  *  *

**(iii)  Report**

Appx-4

\*    \*    \*

**(iv)  Authorization**

\*    \*    \*

**(D) Lump sum catch-up payments for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims**

**(i)   In general**

Not later than 1 year after December 29, 2022, and in accordance with clauses (i) and (ii) of paragraph (3)(A), the Comptroller General of the United States shall conduct an audit and publish in the Federal Register a notice of proposed lump sum catch-up payments to the 1983 Beirut barracks bombing victims and the 1996 Khobar Towers bombing victims who have submitted applications in accordance with subsection (c)(3)(A)(ii)(II) on or after such date of enactment, in amounts that, after receiving the lump sum catch-up payments, would result in the percentage of the claims of such victims received from the Fund being equal to the percentage of the claims of non-9/11 victims of state sponsored terrorism received from the Fund, as of December 29, 2022.

**(ii)  Public comment**

The Comptroller General shall provide an opportunity for public comment for a 30-day period beginning on the date on which the notice is published under clause (i).

**(iii)  Report**

Not later than 30 days after the expiration of the comment period in clause (ii), the Comptroller General of the United States *shall submit* to the Committee on the Judiciary and the Committee on Appropriations of the Senate, the Committee on the Judiciary and the Committee on Appropriations of the House of Representatives, and the Special Master *a report that includes the determination of the Comptroller General on*—

**(I)**   the amount of the proposed lump sum catch-up payment for each 1983 Beirut barracks bombing victim;

**(II)**   *the amount of the proposed lump sum catch-up payment for each 1996 Khobar Towers bombing victim*; and

**(III)**   amount of lump sum catch-up payments described in subclauses (I) and (II).

**(iv)  Lump sum catch-up payment reserve fund**

**(I)    In general**

There is established within the Fund a lump sum catch-up payment reserve fund, to remain in reserve except in accordance with this subsection.

**(II)    Authorization**

Not earlier than 90 days after the date on which the Comptroller General submits the report required under clause (iii), and not later than 1 year after such date, *the Special Master shall authorize lump sum catch-up payments* from the reserve fund established under subclause (I) *in amounts equal to the amounts described in subclauses (I) and (II) of clause (iii)*.

**(III)    Appropriations**

(aa)  In general

There are authorized to be appropriated and there are appropriated to the lump sum catch-up payment reserve fund $3,000,000,000 to carry out this clause, to remain available until expended.

(bb)  Limitation

*Except as provided in subclause (IV), amounts appropriated pursuant to item (aa) may not be used for a purpose other than to make lump sum catch-up payments under this clause*.

**(IV)    Expiration**

(aa)  In general

The lump sum catch-up payment reserve fund established by this clause shall be terminated not later than 1 year after the Special Master disperses all lump sum catch-up payments pursuant to subclause (II).

(bb)  Remaining amounts

All amounts remaining in the lump sum catch-up payment reserve fund in excess of the amounts described in subclauses (I) and (II) of clause (iii) shall be deposited into the Fund under this section.

**(5)  SUBROGATION AND RETENTION OF RIGHTS**

**(A)  United States subrogated to creditor rights to the extent of payment**

\*    \*    \*

**(B)  Rights retained**

\*    \*    \*

**(e)  UNITED STATES VICTIMS OF STATE SPONSORED TERRORISM FUND**

\*    \*    \*

**(v)  Exception for 1983 Beirut barracks bombing victims and 1996 Khobar Towers bombing victims**

Nothing in this subparagraph shall apply with respect to—

(I)  a 1983 Beirut barracks bombing victim or a 1996 Khobar Towers bombing victim who submits an application under subsection (c)(3)(A)(ii)(II) on or after December 29, 2022; or

(II)  the assets, or the net proceeds of the sale of properties or related assets, attributable to a person described in subclause (I).

\*    \*    \*

**(f) ATTORNEYS' FEES AND COSTS**

\*    \*    \*

**(g)  AWARD OF COMPENSATION TO INFORMERS**

\*    \*    \*

**(h)  SPECIAL EXCLUSION FROM COMPENSATION**

\*    \*    \*

**(i)  REPORT TO CONGRESS**

Within 30 days after authorizing the payment of compensation of eligible claims pursuant to subsection (d), the Special Master shall submit to the chairman and ranking minority member of the Committee on the Judiciary of the House of Representatives and the

chairman and ranking minority member of the Committee on the Judiciary of the Senate a report on the payment of eligible claims, which shall include—

(1)  an explanation of the procedures for filing and processing of applications for compensation; and

(2)  an analysis of the payments made to United States persons from the Fund and the amount of outstanding eligible claims, including—

    (A)  the number of applications for compensation submitted;

    (B)  the number of applications approved and the amount of each award;

    (C)  the number of applications denied and the reasons for the denial;

    (D)  the number of applications for compensation that are pending for which compensatory damages have not been paid in full; and

    (E)  the total amount of compensatory damages from eligible claims that have been paid and that remain unpaid.

**(j)  Definitions**

In this section the following definitions apply:

                  *    *    *

**(5)  Fund**

The term "Fund" means the United States Victims of State Sponsored Terrorism Fund established by this section.

                  *    *    *

**(16)  1996 Khobar Towers bombing victim**

The term "1996 Khobar Towers bombing victim"—

(A) means a plaintiff, or estate or successor in interest thereof, who has an eligible claim under subsection (c) that arises out of the June 25, 1996 bombing of the Khobar Tower housing complex in Saudi Arabia; and

(B) includes a plaintiff, estate, or successor in interest described in subparagraph (A) who is a judgment creditor in the proceedings captioned Peterson v. Islamic Republic of Iran, No. 10 Vic.2 4518 (S.D.N.Y.), or a Settling Judgment Creditor as identified in the order dated May 27, 2014, in the proceedings captioned In Re 650 Fifth Avenue & Related Properties, No. 08 Vic.2 10934 (S.D.N.Y. filed Dec. 17, 2008).

**EXHIBIT INDEX**

| | |
|---|---|
| Exhibit A | U.S. Department of Justice, *Response to Government Accountability Office Draft Report* (Oct. 3, 2024) |
| Exhibit B | United States Government Accountability Office, *U.S. Victims of State Sponsored Terrorism Fund: 1983 Beirut Barracks and 1996 Khobar Towers Bombing Claimants Due $614 Million* (Nov. 1, 2024) |
| Exhibit C | The Fairness Act (Dec. 29, 2022) |
| Exhibit D | USVSST Act before the Fairness Act |
| Exhibit E | USVSST Act after the Fairness Act |